**Timothy CONNORS et al.**

v.

**William P. GASBARRO.**

**No. 79–484–Appeal.**

Supreme Court of Rhode Island.

July 22, 1982.

Charles H. McLaughlin, Providence, for plaintiffs.

Higgins, Cavanagh & Cooney, Kenneth P. Borden, Stephen B. Lang, Robert J. Quigley, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is a Superior Court negligence action in which the jury returned a verdict for the defendant. Thereafter, the trial justice granted the plaintiffs' motion for a new trial, and the defendant is before us on an appeal in which he claims that the trial justice misconceived material evidence in considering the new-trial motion and thereby committed prejudicial error. We find merit in this claim.

The defendant, William P. Gasbarro (Gasbarro), testified that in the early-morning hours of July 31, 1974, he was single, twenty-three, and returning to his Barrington home after dropping off a date in Rumford. The route he chose put him in East Providence driving eastward on Warren Avenue, a four-lane, undivided highway. He testified he was driving with his headlights on and that as he approached the point in East Providence where the East Shore Expressway overpasses Warren Avenue, he found his view of the road ahead obstructed by a swell or crest in the highway. As he came up over the crest, he first saw plaintiff, Timothy Connors (Timmy),[1] who was also traveling in the eastbound passing lane but was doing so riding on an unlighted ten-speed bicycle. According to Gasbarro's approximation, when he first sighted the cyclist, Timmy was "somewhere just on the easterly side of the overpass * * * one to two car lengths in front of me." Gasbarro's

---

1. Timmy is joined in this suit by his father, George Connors, who seeks to recover for Tim-my's medical expenses and lost earnings. Timmy sues to recover for pain and suffering.

attempt to bring his vehicle to a quick stop was futile, as was Timmy's attempt, upon being alerted to the car's presence by the screech of brakes, to escape from the path of the auto. Timmy was struck by the left front section of Gasbarro's 1970 two-door Cadillac, was thrown up onto the hood where he rode for some distance, and was eventually cast down onto the roadway as the car came to a halt. At the time of the mishap Gasbarro was proceeding at forty-five miles an hour in an area in which the posted speed limit was forty-five miles per hour.

As a result of the collision, Timmy sustained simple and compound skull fractures, laceration and contusion of the brain, a temporary impairment of his senses of taste and smell, and several less serious injuries. He also suffered partial amnesia and as a result was unable to recollect, and testify to, the events immediately surrounding his traumatic experience.

At the 1979 trial, Timmy testified that at the time of the collision he was seventeen years old and that on the night in question he was attired in white sneakers, blue jeans, and a tan and bright-blue flannel shirt. He described his bicycle as yellow with silver wheels and forks and admitted that it had neither fenders nor lights. He did note, however, that it carried three pieces of reflective tape, one on the forward side of each pedal and a one-inch-by-one-half-inch square on the back of the seat post. Timmy also testified that he was very familiar with the collision scene as it was a spot he passed regularly traveling to and from his home. He offered a possible explanation for his unexpected presence in the passing lane of Warren Avenue when he testified that at the time of his fateful journey the road surface in the travel or right-hand lane was "all broken and split * * * [with] [s]ome holes, eight inches deep, real big around,"

while the surface of the lane he traveled was "smooth and [with] hardly any splits at all." The witness accounted for the late hour of his nocturnal passage homeward by explaining that departure from his girl friend's home was delayed by mechanical problems that revolved around a flat rear tire.

Three members of the East Providence police force testified. One officer related that when he first arrived at the scene of the mishap, Gasbarro spontaneously reported that he was the vehicle's operator and that he had not seen the victim "until he was right on top of him." This officer, in referring to the accident report he had filled out during his on-the-scene investigation, described the street lights as "good" and noted that the road surface was "dry and [with] no defects."

The second officer had measured the skid marks left by Gasbarro's car. The skid marks began just west of the overpass and extended for approximately 220 feet in an easterly direction, ending up at the vehicle's front wheels.

The last officer had conducted a "morning-after" investigation. He corroborated earlier testimony regarding the lack of lights on Timmy's bike. He also stated that the street lighting in the area of the collision was "very poor." The lights to which he referred were situated on poles located along the southerly curb of Warren Avenue on either side of the overpass.[2] One light was situated 164 feet west of the overpass; the second light was located 51 feet east of the overpass. The lights were described in testimony as "old-fashioned" or similar to the screw-in incandescent lights found in one's home.

Two expert witnesses testified about measurements they had taken at the colli-

---

2. An eastbound motorist on Warren Avenue who is traveling near the place where the collision occurred encounters two overpasses that are in close proximity to each other. The first span actually serves as an exit ramp for the eastbound motorist on interstate Route 195 who wishes to travel south along the Wampanoag Trail toward such municipalities as Bar-

rington, Warren, or Bristol. The second span serves as an access ramp for the motorist who desires to travel northward along the Trail to Route 195 and then proceed westward toward Providence. This litigation revolves about the second overpass. The rise in the roadway is west of the overpass, and the collision occurred to its east.

sion scene. Peter S. Jussila, civil engineer and road-design specialist for Rhode Island's Department of Transportation, reported that the distance from the crest in Warren Avenue (where Gasbarro testified he first sighted Timmy) to the easterly side of the East Shore Expressway overpass (thought to be the point of impact) measured out to 260 feet. Surveyor John Flock testified that he had measured a distance of 275 feet between these two points. The physical evidence indicated that the collision occurred when the area around the left front headlight came in contact with the rear wheel of Timmy's bicycle.

After deliberating upon the evidence, the jury returned a verdict for defendant. The plaintiffs then moved for a new trial, which the trial justice granted, stating:

"After reviewing all of the testimony and giving due consideration to the appearance of the witnesses and their manner of testifying, I am satisfied beyond any question whatsoever that Mr. Gasbarro was either deliberately lying or that he was sadly mistaken regarding his recollection of the facts on the occurrence that took place on July 31, 1974. The statement made by him that he didn't see the Plaintiff until he was one or two car lengths before him just doesn't make any sense unless he was driving with his lights out or off, and he said he had his lights on. Any vehicle traveling at 45 miles per hour as Mr. Gasbarro said he was traveling with his headlights on should be able to take in view anything on the highway 40 feet before him. So that Mr. Gasbarro, as I indicated before, simply was mistaken or deliberately lying. He just simply wasn't paying attention to what was going on at that particular location and on that particular evening. His skid marks indicate[d] he must have seen the Plaintiff while at least 219 feet away and not 40, as he testified. * * [T]his was comparative negligence, and on comparative negligence, all that the jury is required to do under our law is to find some degree or some percentage of negligence on the part of the Defendant. * * * [I]n light of the fact that the

Defendant at no time sounded his horn or anything of that nature, it is inconceivable to me that the Jury took my instructions and understood my instructions on the question of comparative negligence."

■ As this court has said on so many occasions, the trial justice, when considering a motion for new trial, assumes the role of a super-juror because the justice brings into play his or her more experienced judgment by independently reviewing all of the material evidence in the light of the charge to the jury, passing upon the weight thereof, and assessing the credibility of the witnesses who appeared at trial. Once the trial justice has completed the factfinding chore, a choice has to be made. In those instances in which the trial justice determines that the evidence and the reasonable inferences to be drawn therefrom are so nearly balanced that reasonable individuals could arrive at different results in consideration of the case, the new-trial motion must be denied. If the trial justice's judgment leads to the conclusion that the jury's verdict is against the fair preponderance of the evidence, a new trial is a necessity. A ruling made by a trial justice on a motion for a new trial is entitled to great weight and will not be disturbed on appeal unless the trial justice has overlooked or misconceived material evidence or is otherwise clearly wrong.

■ If the defendant sustains the burden of demonstrating to this court that the trial justice, in his consideration of a new-trial motion, has misconceived material evidence, then this court applies the so-called appellate rule and looks at the evidence in the light most favorable to the party who prevailed before the jury, and the jury's verdict will be sustained if there is "any competent evidence which supports the verdict."

In his charge the trial justice reminded the jury that before Timmy could recover damages, he had to prove that Gasbarro was negligent. "If you find no negligence * * *," he said, "that is the end of the case. Go no further." "Negligence" was defined

as "the failure of a person to do or not [to] do something that a reasonably prudent person would have done or would not have done under the same or similar circumstances as existed at the time and the place of the accident in this case."

The jury began its deliberations on the third and final day of the trial at 3:50 p. m. and terminated them for the day approximately a half hour later. The following morning deliberations resumed at 10:10 a. m. and about an hour later (11:13 a. m.), the jury returned with a verdict for Gasbarro.

■ In his grant of a new trial, the trial justice misconceived material evidence on two occasions. As noted earlier, he alluded to the skid-mark testimony, which indicated that a set of skid marks began west of the overpass and extended in a somewhat easterly direction for 220 feet, ending at the front tires of Gasbarro's car. The trial justice inferred from this evidence that Gasbarro had first seen Timmy from a distance of at least 219 feet away and not from the 40 feet to which he had testified. In making this conclusion, the trial justice relied on faulty reasoning.

Just prior to the collision, Timmy and Gasbarro were both proceeding in an easterly direction, and it is uncontradicted that after the initial contact between the bike and the automobile, Timmy came up onto the hood of Gasbarro's vehicle and remained there for a portion of the time as the automobile tires continued to leave their impression on the roadway. Thus, the 219 feet of skid marks in and of themselves prove nothing in regard to the location at which Timmy was first seen by Gasbarro.

The trial justice also noted that the Department of Transportation's engineer had testified at trial that once an eastbound motorist reached the rise in the roadway, he or she would then have an "unobstructed view" of about 260 to 275 feet "to the overpass or scene of the accident." The record indicates, however, that the special-

ist did not speak in terms of "unobstructed view." In fact, there is no indication that the expert ever went out onto Warren Avenue to the rise and from there looked eastward. His testimony consisted of an analysis of two documents: a 1929 plan that indicated the layout of Warren Avenue and a 1958 document that concerned construction of the overpass. By measuring the distances depicted on these two documents, he estimated the distance between the crest of the road and the easterly side of the overpass as being approximately 260 feet. The only "unobstructed view" testimony presented came from the surveyor, who estimated that if one was 20 feet east of the overpass and looked in a westerly direction, he would have an unobstructed view for 550 feet. This testimony, however, was totally irrelevant because the crucial issue is not what the westbound motorist observes but what a motorist such as Gasbarro observed while traveling easterly along Warren Avenue in the dead of the night and the early-morning hours of July 31, 1974.

The trial justice also remarked that he was satisfied that the jury had "simply misconceived the entire thrust" of his instructions relative to comparative negligence and ignored the fact that Gasbarro "was travelling in the wrong lane at the particular time in violation of one of the rules of the road." When speaking of the rules of the road, the trial justice pointed out that "every person operating a bicycle upon a roadway shall ride as near to the right side of the roadway as practicable * * *." In making this statement, the trial justice was paraphrasing G.L.1956 (1968 Reenactment) § 31–19–8.[3]

Later the trial justice went on to say that the law governing a bicyclist also applies to the operator of a motor vehicle but then, in explanation thereof, quoted to the jury the initial portion of § 31–15–1, which provides that "[u]pon all roadways of sufficient width a vehicle shall be driven upon the

---

3. The laws governing the operation of bicycles were amended by the General Assembly at its January 1976 session with the passage of P.L. 1976, ch. 58, § 2, so that the "as near to the right side of the roadway as practicable" mandate is now to be found in G.L.1956 (1968 Reenactment) § 31–19–6, as amended.

right half of the roadway." Although the trial justice, as he ruled on the new-trial motion, might have had in mind § 31–19–8's mandate to the bicyclist, the evidence clearly indicates that Gasbarro and his vehicle were at all times proceeding along the right half of Warren Avenue and were not in violation of § 31–15–1.

The evidentiary misconceptions to which we have alluded in this opinion require us to invoke the appellate rule and look at the record in the light most favorable to Gasbarro to determine if there is any credible evidence that would support the jury's verdict.

A formidable bulk of evidence points the finger of negligence at Timmy and away from the defendant. Timmy elected to wear predominantly dark clothes for his midnight bicycle ride. His vehicle was not equipped with rear lights. It had no rear reflectors, save for a miniscule piece of tape attached to the seatpost. Having made himself virtually invisible to anyone approaching him from behind, Timmy then navigated his way homeward in the high-speed lane of a highway. Not only is there some evidence but there is also an overwhelming preponderance of evidence supporting a jury's decision that Timmy's carelessness was the sole proximate cause of the misfortune that befell him and his family.

The defendant's appeal is sustained, the order appealed from is vacated, and the case is remanded to the Superior Court for entry of judgment in conformance with the jury's verdict.

WEISBERGER, J., did not participate.