**STATE**

**v.**

**Robert R. VANASSE et al.**

**No. 90–142–C.A.**

Supreme Court of Rhode Island.

June 19, 1991.

---

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for plaintiff.

Scott Partington, Bigos, Burns & Partington, Pawtucket, Joel D. Landry, Landry & Connors, Providence, for defendants.

## OPINION

SHEA, Justice.

This matter is before the Supreme Court on the defendants' appeal from a judgment of conviction of first-degree sexual assault entered after a jury trial. We affirm.

The evidence in this case depicts the appalling environment in which a young child, victimized by sexual assault, was forced to live. At the time these events occurred, the victim, Mary Sue,[1] was six years old. She was the oldest of six children, all born to Mary Sue's mother, Ann Elliot–Diel (Ann Elliot). During the summer of 1983, Ann Elliot was married to defendant James Diel. Ann Elliot's second child was born of that brief union. James Diel was Mary Sue's stepfather. Ann Elliot's third child was born while she was still married to James Diel, but was not living with him as she was cohabitating with Norman Murphy. A total of three children were born as a result of that extramarital relationship.

The various residences of what was an itinerant family included a tenement house on Aleppo Street in Providence where Mary Sue lived with what could best be termed an extended family composed of the Elliots, the Diels, and the Murphys. Ann Elliot's mother, Muriel Smith, resided at that house. Evidently Smith, in addition to furnishing shelter for Ann Elliot's children, provided most meals and necessities. Ann Elliot did very little cooking or caring for herself or for her children.

The tenement house comprised two stories. Muriel Smith and her husband occu-

---

1. For the purpose of protecting the anonymity of the victim we shall refer to her by the fictitious name of Mary Sue.

pied one of the apartments on the first floor. A description of the three-room apartment reveals its meager character: a kitchen area, a living room with no furniture, and a single bedroom, scattered with a few beds, video equipment, televisions, and stereos.

Among the occasional overnight visitors who slept in Smith's apartment during the summer of 1983 were Ann Elliot along with Mary Sue and her brothers; Stacia Elliot, Melissa Elliot, and George Elliot, the sisters and brother of Ann Elliot; and defendant James Diel. Apparently, defendant Robert R. Vanasse (Vanasse), a close friend of James Diel's, was a frequent daytime visitor to the apartment. Overnight accommodations were tight since those who chose to sleep there slept "everywhere" and "on top of everything." In one of the second-floor apartments, Norman Murphy (Murphy), who spent a considerable amount of time downstairs with Ann Elliot, lived with his wife, Lottie Murphy.

The testimony at trial revealed that interrelationships and promiscuity among family members and friends abounded. James Diel's family members were interrelated or married to Ann Elliot's family members. In fact Ann Elliot's brother and one of her sisters were married to a sister and a brother of James Diel's. Concededly the evidence lends itself to confusion. Ann Elliot's sister, Leola Diel, who happened to have married James Diel's brother, Richard Diel, tried to explain but probably added to the confusion at trial when she testified. We cite a portion of the transcript:

"This is where it's mixed up. Annie [Ann Elliot] would go from Norman [Murphy] to Jimmy [James Diel], from Jimmy [James Diel] to Norman [Murphy], and Jimmy [James Diel] would go with Stacia [Elliot]. And at the time this all was happening, Stacia [Elliot] wanted Bobby [Vanasse], Ann Diel–Elliot [Ann Diel] wanted my brother George [Elliot], and Norman wanted—Oh, God. Wait a minute. Stacia [Elliot] was going with

Jimmy [James Diel], Bobby [Vanasse] was going with Ann Diel Elliot [Ann Diel]. Norman [Murphy] was going with Lottie [Murphy]. Everybody was going with everybody. Stacia wanted Bobby [Vanasse], she didn't want Jimmy [James Diel]. Georgie [George Elliot] wanted Annie [Ann Diel], he didn't want Peggy [?]. Norman wanted to go back with Annie [Ann Elliot], between Annie [Ann Elliot] and Lottie [Murphy] because Ann [Elliot] was having his child.

"It was like a circus. It's like who's going to bed with who, that's the only thing I know. This is true." [2]

The scene at Aleppo Street having been set, evidence was presented at trial that established the following. Leola Diel, Ann Elliot's sister (Mary Sue's aunt), testified that between May and September of 1983 she lived on Aleppo Street in an apartment in the immediate vicinity of Muriel Smith's apartment. (At the time of trial she was divorced from Richard Diel, James Diel's brother.) She testified that between those dates she observed both defendants, James Diel and Vanasse, frequently at Muriel Smith's apartment. Apparently when Vanasse or James Diel entered the apartment, Mary Sue would run and hide, sometimes under the kitchen sink. During this period Vanasse would often take Mary Sue, with the consent of her mother, to "a picnic or out to the park." When they returned, Mary Sue would always have money or candy because, according to Vanasse, she was behaving or "being a nice girl." Leola also observed that Vanasse often played with Mary Sue. According to Leola, one time when this activity occurred in the back yard, Vanasse had a "slight erection." She also noticed stains on Vanasse's pants in the groin area and conceded, "It could have been from * * * him going to the bathroom [or] it could have been from him coming to a slight climax."

When Mary Sue first told Leola that she had been sexually abused, Leola began to ask questions. Mary Sue stated that Mur-

**2.** James Diel's sister, Ann Diel, had married Ann Elliot's brother, George Elliot. Eventually Stacia Elliot married defendant Robert Vanasse, and they remained married at the time the trial justice imposed sentence.

phy and James Diel had sexually assaulted her. According to Leola, Mary Sue told her that James Diel had "stuck his finger in her vagina, and then made her suck his penis." The only thing Mary Sue said about Vanasse was that she hated him. Mary Sue was crying and begged Leola not to tell her mother. Nevertheless, Leola approached Ann Elliot and told her everything. When Ann Elliot did not believe the accusations, Leola showed her Mary Sue's vaginal area. According to Leola, it was painful, "raw," and "looked like a grown woman's." There were "spots of blood on it where you could see she had been touched." Ann Elliot remained unconvinced and called Leola a liar.

Leola then confronted James Diel with the allegations of sexual abuse, to which he responded, "So what if I did. If anybody said anything, I'm going to * * * them up." Vanasse, who also heard the allegations, just laughed. For fear of her own safety and that of Mary Sue, Leola did not contact the Department of Children and Their Families (DCF) until eleven days later. Leola ultimately contacted a DCF employee, whereupon DCF immediately removed Mary Sue from her home and sent her to the hospital for examination.

Murphy testified at trial and admitted to his simultaneous involvement with Ann Elliot and his wife, Lottie. He conceded that while he was cohabitating with Ann Elliot, she was also "sleeping" with James Diel. Murphy also admitted to pleading guilty to the charge of second-degree child molestation in September of 1983. The victim was Mary Sue.

According to Murphy, Vanasse and James Diel would visit the Aleppo Street apartment "very often" during the period between May and September of 1983. Ann Elliot would often leave her daughter, Mary Sue, in the care of James Diel and Vanasse. Murphy testified that when drinking, James Diel admitted to having sexually abused Mary Sue: "[Diel] used to say that he enjoyed it very much and he used to like to * * * her. * * * That she did anything he wanted. * * * That he liked her because she was soft and all that

kind of weird stuff. * * * All that kind of sick perverted stuff."

Murphy testified that on at least two occasions he witnessed James Diel penetrate Mary Sue's vagina with his finger. On both occasions James Diel was in the bedroom of the Aleppo Street apartment. According to Murphy, James Diel had his pants down to his ankles, and Mary Sue, who was wearing a dress with no underwear, would be sitting there crying. Murphy also recalled another occasion when Mary Sue was sitting on James Diel's lap, and while his dungarees and underwear were down to his knees, he rubbed his penis against her vagina. In all three instances Mary Sue was clothed in a dress with no underwear and would "always be crying." When Murphy brought it to the attention of Ann Elliot, she laughed in his face.

Murphy testified that Vanasse also admitted to having sexual relations with Mary Sue. According to Murphy, Vanasse actually stated that he liked to perform cunnilingus on her. Murphy twice observed Vanasse in the Aleppo Street apartment having sexual relations with Mary Sue. On one occasion in the basement Mary Sue was on her knees engaging in fellatio with Vanasse. Vanasse had his hand on her head, forcing it to go back and forth. Murphy saw Vanasse do the same thing to Mary Sue in the bedroom. On that particular occasion Vanasse, who happened to notice Murphy, told him not to tell anyone. When Murphy told Mary Sue's mother, she laughed once again. On a third occasion Murphy also saw Vanasse engage in cunnilingus with Mary Sue.

Melissa Elliot, one of Ann Elliot's sisters and an aunt to Mary Sue, testified at trial. She was thirteen years old at the time of trial. During the summer of 1983 Melissa frequently saw James Diel giving Mary Sue money and candy. At one point during that summer while Melissa was living on Aleppo Street, she observed James Diel lying on top of Mary Sue. When Diel became aware of Melissa's presence, he immediately got off Mary Sue, walked toward a window with his back toward Melissa,

and pulled up his zipper. Mary Sue's shorts and underpants were around her ankles and Melissa could see her bare skin. Mary Sue pulled up her panties and shorts and told Melissa not to tell anyone.

Mary Sue testified at trial. She stated that Vanasse would visit the Aleppo Street apartment about every other week. She remembered being lured to the basement of that apartment house, because according to Mary Sue, "[Vanasse] said he had a present for me." When Mary Sue went to the basement, however, there was never a gift. Instead, Vanasse placed a mattress on the floor and pulled down both of their pants. Then he lay on top of her, inserted his penis into her vagina, and "moved it in and out." Mary Sue experienced pain. When finished, Vanasse warned Mary Sue not to tell anyone or else, he threatened, he would do it again.

On another occasion Vanasse accompanied Mary Sue to his house where a woman whom Mary Sue did not know was already there.[3] The three went upstairs to his bedroom. The woman and Vanasse undressed and started having intercourse during which Vanasse remarked, "This is how you do sex." After Vanasse finished with the woman, he placed Mary Sue on the same bed and had intercourse with her.

On a third occasion when Mary Sue was at Vanasse's house, he took his penis out of his pants and "rubbed it back and forth" in front of her face until "white stuff started coming out." It went into Mary Sue's mouth and, she testified, "I threw it up." Yet another time Vanasse drove Mary Sue and her brothers to "some tall grass near a bridge." Vanasse removed his pants and inserted his penis into her vagina and then stated, "This is the moment I've been waiting for." On another occasion Mary Sue was roller-skating with her aunt, Melissa Elliot, when Vanasse told her that a friend of hers was waiting for her in back of a house across the street. Mary Sue removed her skates and went to the back of the house to find that her friend was not there. Instead Vanasse was waiting for her. He put her into his car and took her to a bakery. On the way Vanasse inserted his finger into her vagina.

Mary Sue testified that defendant James Diel visited the Aleppo Street apartment regularly between May and September of 1983. Once during that period he took her to the same basement Vanasse had taken her to on a prior occasion. Like Vanasse, James Diel told Mary Sue that he had a present for her. When she descended to the basement, Diel had no present. Instead the mattress was already on the floor, whereupon Diel removed both of their pants, lay on top of her, and inserted his penis into her vagina. Mary Sue again experienced pain as he moved in and out. Afterward Diel warned Mary Sue not to tell anyone or else he would kill her mother. Apparently Diel had physically abused Mary Sue's mother in the past. Nevertheless, when Mary Sue informed her mother, Ann Elliot did not believe her.

On cross-examination Mary Sue admitted that when Detective Donald Alberico interviewed her at the Providence police station, she did not relate the tall-grass incident, the incident on the stairs in the house, and the incident that occurred on the trip to the bakery. She also admitted to having falsely accused Murphy of having anal intercourse with her.

Doctor Celeste Corcoran testified at trial. On September 16, 1983, Dr. Corcoran examined Mary Sue for evidence of sexual abuse. The genitalia showed no evidence of abrasions, lacerations, or recent forced penetration. The vaginal area was "essentially normal." However, she explained, the vagina is profusely supplied with blood

---

3. The stranger happened to be James Diel's sister, Ann Diel, who at the time was married to Ann Elliot's brother (Mary Sue's uncle), George Elliot. Because of Ann Diel's involvement in this particular incident, she was indicted along with James Diel and Vanasse in counts 5 and 6. Count 5 charged Ann Diel with aiding and abetting Vanasse in committing sexual assault. Count 6 charged Vanasse and Ann Diel with conspiracy to commit the crime of first-degree sexual assault. The trial justice directed a verdict for defendants Vanasse and Ann Diel on counts 5 and 6 and suggested that Ann Diel would have been more properly charged with contributing to the delinquency of a minor.

and heals rapidly, within one to three days after sexual activity. She also testified that the fact that Mary Sue's hymen remained intact was not indicative as to whether a sexual assault had occurred. Doctor Corcoran characterized Mary Sue's overall physical condition as "filthy."

Vanasse was the only defendant to testify. He denied having ever sexually abused Mary Sue.

After the close of all the evidence, defendants James Diel and Vanasse moved for judgments of acquittal, which were denied. The case was submitted to the jury, which rendered verdicts of guilty on counts 1, 2, and 3.[4] Upon denial of defendants' motion for a new trial, the trial justice sentenced James Diel to fifty years' imprisonment, twenty years suspended, with twenty years' probation, and Vanasse to two concurrent fifty-year terms of imprisonment, twenty years suspended, with twenty years' probation.

On appeal defendants raise four issues. Additional facts will be supplied as necessary.

## I

The defendants first contend that the forty-four-month preindictment delay resulted in severe prejudice that violated their due-process rights. The facts as they relate to this issue are as follows.

When the first allegations of sexual abuse arose in September 1983, Mary Sue was placed in the custody of DCF. Subsequently, Mary Sue was twice interviewed by Providence Police Detective Robert Coogan. During these interviews Mary Sue accused Norman Murphy of sexual molestation. At neither time, however, did Mary Sue accuse James Diel or Vanasse. Murphy later made a damaging admission to Detective Coogan, and he was thereafter charged with second-degree sexual assault. Nevertheless Murphy did not implicate James Diel or Vanasse.

Approximately a month after Murphy was charged, Gloria Manna of DCF informed Detective Coogan that additional allegations of sexual abuse had surfaced which included the names James Diel and Robert Vanasse. However, no formal investigation was pursued at that time primarily because of the emotional distress Mary Sue was experiencing. Apparently DCF had informed Detective Coogan that Mary Sue was then under psychological treatment because of the trauma of the events surrounding the criminal investigation of Norman Murphy. These circumstances prompted Detective Coogan to delay any investigation of the allegations against James Diel and Vanasse.

In April of 1987 the police initiated an investigation as a result of allegations of sexual abuse from Mary Sue's family and Mary Sue's therapist. An indictment was returned by the State of Rhode Island on July 2, 1987, charging James Diel and Robert R. Vanasse with first-degree sexual assault.

The defendants assert that in the circumstances of this case a forty-four-month preindictment delay created a denial of due process by violating "fundamental conceptions of justice" and the "community sense of fair play and decency."

Any discussion regarding the constitutionality of preindictment delays necessarily begins with *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In *Marion* the respondents argued that a thirty-six-month preindictment delay was so substantial and inherently prejudicial that the Sixth Amendment required the dismissal of the indictment. The Court held, however, that the speedy-trial provision of the Sixth Amendment had no application until the putative defendant in some way became an "accused," an event that is triggered by either a formal indictment or "actual restraints imposed by arrest." *Id.* at 320, 92 S.Ct. at 463, 30 L.Ed.2d at 479. Had the framers of the Constitution intend-

---

**4.** Upon the close of the state's case in chief, the trial justice directed a verdict for defendants Vanasse and Ann Diel on counts 4, 5, and 6. Count 4 charged Vanasse with anal penetration.

Counts 5 and 6 charged Ann Diel with aiding and abetting Vanasse and conspiring with Vanasse to commit first-degree sexual assault.

ed for the speedy-trial provision to protect against preaccusation delay, in the Court's view, they "could hardly have selected less appropriate language." *Id.* at 314, 92 S.Ct. at 460, 30 L.Ed.2d at 475. Conceding that possible prejudice was inherent in any delay, the Court recognized, nevertheless, that the applicable statute of limitations provided an existing mechanism to guard against the prejudice resulting from the passage of time between the crime and the indictment. They provide the "primary guarantee" against the government's instituting "overly stale criminal charges." Consequently the Court concluded, "There is thus no need to press the Sixth Amendment into service to guard against the mere possibility that pre-accusation delays will prejudice the defense in a criminal case since statutes of limitation already perform that function." *Id.* at 323, 92 S.Ct. at 465, 30 L.Ed.2d at 480.

Nevertheless, the Court noted that the statute of limitations does not fully define a defendant's right with respect to a preindictment delay and suggested that the due-process clause of the Fifth Amendment would protect, in some circumstances, against oppressive preindictment delay. The Court, however, declining to find that the factual circumstances in *Marion* warranted the protections of due process, concluded, "No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." *Id.* at 325, 92 S.Ct. at 466, 30 L.Ed.2d at 481–82.

Six years later in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct.2044, 52 L.Ed.2d 752 (1977), the Supreme Court, in its assessment of *Marion*, made the following comment:

> "Thus *Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* at 790, 97 S. Ct. at 2048–49, 52 L.Ed.2d at 759.

■ In light of *Marion* and *Lovasco*, it is clear that in order for defendants to prevail on a due-process claim, they must demonstrate not only that the preindictment delay caused them actual prejudice but additionally that the prosecution intended such delay in order to gain some tactical advantage. *United States v. Acevedo*, 842 F.2d 502, 504 (1st.Cir.1988); *United States v. Lebron–Gonzalez*, 816 F.2d 823, 831 (1st Cir.1987).

■ In the case at bar we are not persuaded that defendants have satisfied either of the two requirements espoused in *Marion* and *Lovasco*. They fail to demonstrate that they suffered actual prejudice as a result of the preindictment delay. They rely on the prejudice resulting from faded memories, the increased difficulty in establishing an alibi, and the unavailability of a witness. This prejudice is exactly the type of prejudice that the *Marion* Court deemed "inherent in any extended delay." The Court itself recognized that although "memories [may] dim, witnesses become inaccessible, and evidence [may] be lost," nevertheless, "[i]n light of the applicable statute of limitations * * * these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment." *Marion*, 404 U.S. at 326, 92 S.Ct. at 466, 30 L.Ed.2d at 482.

The mere possibility, therefore, that the preindictment delay would cause defendants prejudice is insufficient to demonstrate a due-process violation. Consequently due-process claims not based on actual prejudice will be characterized as "speculative and premature." *Id.* at 326, 92 S.Ct. at 466, 30 L.Ed.2d at 482. Clearly defendants' assertions that prejudice resulted from faded memories and lost alibis are at best speculative. There is no evidence to demonstrate that actual prejudice occurred. The defendants rely substantially on the death of a witness, Dr. William Quigley, who examined Mary Sue at the same time as Dr. Corcoran. However, the evidence clearly suggests that Dr. Quigley's testimony was similar, if not identical,

to Dr. Corcoran's. To the extent that such evidence was exculpatory, it was presented to the jury through a substitute source—Dr. Corcoran's testimony. Any allegations suggesting that the unavailable witness's testimony would provide materially exculpatory evidence are at best speculative and "clearly fail to demonstrate actual prejudice." *United States v. Bartlett,* 794 F.2d 1285, 1291 (8th Cir.1986).

Since defendants fail to demonstrate actual prejudice, we need not determine whether the government intentionally delayed the investigation for some tactical advantage. Nevertheless, we shall address this issue in light of defendants' serious belief that "fundamental conceptions of justice which lie at the base of our civil and political institutions as well as the community sense of fair play and decency have indeed been impugned by this unwarranted, reckless and suspect delay." As support for this contention, defendants again rely on *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), where the United States Supreme Court discussed at length the circumstances that might justify the government's preindictment delay. Specifically, defendants draw support from the Court's observation that "[t]he decision to file criminal charges, with the awesome consequences it entails, requires consideration of a wide range of factors in addition to the strength of the Government's case, in order to determine whether prosecution would be in the public interest." *Id.* at 794, 97 S.Ct. at 2051, 52 L.Ed.2d at 761–62.

Vanasse avers that it can never be in the public interest to delay the prosecution of one accused of sexually abusing a six-year old child. Arguably this assertion is correct. Nevertheless, the public interest is only one factor among an array of others that the trial court must consider when determining whether prosecutorial delay was justified in the circumstances. Among the other factors, which the Supreme Court recognized in *Lovasco,* is the reluctance of the victimized child to testify. Indeed the trial justice, in considering defendants' motions to dismiss the indictments, specifically addressed this concern:

"I am naturally troubled by the delay in bringing this Indictment. But in reviewing the facts in my own mind, and having looked at some of the documents in the file, it becomes quite apparent as to how this subsequent late Indictment came about. It all started with the original charge against a Defendant named Murphy, who apparently admitted his involvement with the same victim, Mary Sue, and pleaded to the charge, and was sentenced and went to jail.

"While all this was going on, apparently the victim was taken out of the custody of whoever her parents were at the time [and] put in the custody of the Department of Children and Their Families. Because of the horrendous things that happened to her, she apparently needed a great deal of psychotherapy."

In our view the circumstances surrounding the delay in this case in no way demonstrate a "tactical" delay that would violate the due process clause of the Fifth Amendment. Contrary to defendants' assertion, the delay was not "unwarranted" and "reckless." A traumatized six-year-old child, victimized by repeated sexual abuse, should not be required to endure relentless emotional trauma in order to assure defendants of expedient disposition of possible future criminal charges. Due-process, in our opinion, does not require such a result. The evidence demonstrates that the police deferred to the recommendations of DCF to halt further investigation into additional charges of sexual abuse temporarily in order to protect the interests and the emotional well-being of the victim. According to Detective Coogan, "For the good of the child, I would not drag her through another investigation." Indeed, the Rhode Island Constitution compels such a result: "A victim of crime shall, as a matter of right, be treated by agents of the state with dignity, respect and sensitivity during all phases of the criminal justice process." R.I. Const. art. I, sec. 23. The sensitivity that Mary Sue required meant time for psychotherapy and a necessary reprieve from the further trauma that she would necessarily endure once defendants were indicted. The rea-

sons for delay, in our view, were legitimate. Consequently the trial justice properly denied defendants' motions to dismiss based on preindictment delay.

## II

■ Next defendants contend that the denial of their motions to sever and the failure of the trial justice to grant separate trials unduly prejudiced them to the extent that it impinged on their Sixth Amendment right to a fair trial. They argue that because the evidence disclosed that each defendant committed separate acts of sexual molestation, each was prejudiced by the "spill-over" effect of evidence adduced against the other.

In arguing that severance was improperly denied, defendants rely substantially on our decision in *State v. Cassey*, 543 A.2d 670 (R.I.1988). In *Cassey* we held that the denial of a motion to sever trial of the defendants, each charged with three separate counts of first-degree sexual assault upon a five-year-old child, was not an abuse of the trial court's discretion.

The defendants assert that *Cassey* is distinguishable from the case at bar because in *Cassey* we specifically acknowledged that "the prosecution had received a considerable amount of evidence * * * that indicated that [the defendants] were each aware of the other's activities." 543 A.2d at 673. The defendants fail to realize, however, that the preceding recognition solely concerned our inquiry into whether those defendants had been properly joined in the same indictment. Accordingly, we made reference to Rule 8(b) of the Superior Court Rules of Criminal Procedure, which provides:

> "Joinder of Defendants. Two (2) or more defendants may be charged in the same indictment, information, or complaint if they are alleged to have participated in the same act or transaction or *in the same series of acts or transactions* constituting an offense or offenses." (Emphasis added.)

The fact that in *Cassey* there was evidence tending to show that the defendants were aware of each other's activities was suffi-

cient, in our view, to demonstrate that they had participated in the same series of acts or transactions and that, therefore, the joinder of the defendants in the same indictment was justified.

In the case at bar the evidence portrays two friends, Vanasse and James Diel, as frequent visitors to Muriel Smith's apartment on Aleppo Street. Of significance is the fact that James Diel and Vanasse would both lure Mary Sue to the same basement with the promise of giving her a present. Instead of a present, however, there was a mattress on the floor where sexual assault ensued each time. Moreover, both defendants would brag about their sexual exploits to the same man, Murphy. We believe that this evidence sufficiently demonstrates that defendants participated in the "same series of acts or transactions constituting an offense or offenses." Consequently we are at least satisfied that defendants were properly joined in the same indictment.

■ Addressing whether the motion for severance was improperly denied, we initially consider the well-established principle under Rhode Island law that severance is not a matter of right but is an issue directed to the sound discretion of the trial justice. *State v. Cassey*, 543 A.2d at 673. Consequently the denial of a motion to sever will not be reversed on review unless there is a clear abuse of discretion. *Id.* Discretionary abuse will exist only in circumstances in which a defendant affirmatively demonstrates that he in fact has suffered prejudice as a result of the joint trial to the extent that it has impinged upon his right to a fair trial. *Id.*

■ Contrary to defendants' assertions, abuse of discretion is not to be measured by the deficiency of evidence demonstrating that defendants were aware of each other's criminal activity. Such an analysis, as we have said, is more properly relevant to the inquiry regarding whether defendants were properly joined in the same indictment.

The trial justice, in considering whether there is sufficient prejudice to warrant sev-

erance, must necessarily balance the right of a defendant to a fair trial against "the public's interest in efficient and economic administration of justice." *Cassey,* 543 A.2d at 674. Any decision must be made with a view to the rights of all parties, including those of the victim, while having regard for what is "right and equitable under all of the circumstances." *State v. Whitman,* 431 A.2d 1229, 1233 (R.I.1981). When circumstances prevail such as those in the case at bar, the trial justice is further required to consider the "horrendous burden" that would be imposed upon an emotionally distraught child of tender years in the event that the victim is "required to testify on two separate occasions concerning the outrageous and revolting circumstances involving these defendants." *Cassey,* 543 A.2d at 674. As we held in *Cassey,* "Certainly in order to balance the right of this child witness to have [her] ordeal limited to one trial in respect to these defendants, a most compelling prejudice would be required to be shown in order to establish that the trial justice had committed an abuse of discretion in denying the motion to sever." *Id.*

The prejudice claimed by defendants fails to rise to the level of compelling prejudice. We are not persuaded by the argument that because each defendant committed separate acts of sexual molestation, each was prejudiced by the "spill-over" effect of the evidence adduced against the other. If the evidence was at all disparate, the jury would have had little difficulty in distinguishing such evidence as it pertained to each defendant. Moreover, we have previously held, "[T]he fact that evidence against a codefendant may have been proportionately greater than the evidence against the complaining defendant is not itself grounds for a severance." *Cassey,* 543 A.2d at 674 (citing *United States v. Peters,* 791 F.2d 1270, 1302 (7th Cir.1986); *United States v. Hendrix,* 752 F.2d 1226, 1232 (7th Cir.), *cert. denied,* 471 U.S. 1021, 105 S.Ct.2032, 85 L.Ed.2d 314 (1985)). We also recognize that there were no antagonistic defenses, nor did Vanasse through his testimony implicate James Diel, making an analysis under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) unnecessary.

In light of these reasons we are not convinced that defendants have demonstrated compelling prejudice necessary to render the denial of the motion for severance an abuse of discretion. We subscribe to our sentiments as expressed in *Cassey:* "Indeed, considering the nature of the offenses, the age of the witness, and the burden imposed upon that witness by being required to testify concerning shocking subject matter in two separate trials, the trial justice did not err in denying the motion for severance." *Cassey,* 543 A.2d at 674.

## III

Next defendants contend that the trial justice erred in denying their motion for a new trial. When confronted with a motion for a new trial, the trial justice, while exercising independent judgment and considering all material evidence in light of the charge given to the jury, must appraise the weight of the evidence and assess the credibility of witnesses. He may accept or reject conflicting testimony and draw all reasonable inferences therefrom. *Beauchemin v. Sweeten,* 471 A.2d 624, 626 (R.I.1984). If in this independent assessment the trial justice determines that the evidence adduced at trial is sufficient for the jury, as factfinders, to conclude that it proves guilt beyond a reasonable doubt, the motion for a new trial must be denied. *State v. McGranahan,* 415 A.2d 1298, 1302 (R.I.1980) (citing *State v. Barnes,* 122 R.I. 451, 409 A.2d 988 (1979)). Even if the evidence and reasonable inferences drawn therefrom are so nearly balanced or are such that reasonable minds could arrive at different results, the trial justice must deny the motion for a new trial. *Connors v. Gasbarro,* 448 A.2d 756, 759 (R.I.1982).

If the trial justice has sufficiently articulated the rationale for whatever decision he or she has rendered, then such ruling is entitled to great weight and will not be disturbed by this court unless the trial justice overlooked or misconceived material evidence or was otherwise clearly

wrong. *State v. Tarvis*, 465 A.2d 164, 174 (R.I.1983).

■ Applying these principles to the case at bar, we believe that the trial justice properly denied defendants' motions for a new trial. The trial justice carefully assessed the credibility of each witness individually and considered the possible motives for the witnesses to lie under oath:

"What motive did Norman Murphy have to testify for the prosecution? He's on probation right now—on a suspended sentence. He took a serious risk. If he ever testified falsely under oath, he could become a candidate for a suspension. [He] had absolutely no motive * * * except that his conscience bothered him. " * * *

"At no time during the trial did I hear anybody bring out anything to indicate that Melissa Elliot or Leola Diel or even Norman Murphy, for that matter, had any particular grudge against James Diel. There was no motive to incriminate him. Nobody brought that out. I was looking for that during the trial. I never saw it. " * * *

"Now with respect to the child herself, I observed her very closely. * * * I thought [her] testimony was very credible."

The trial justice acknowledged Murphy's alcoholism at the time the events occurred but nevertheless labeled his testimony "very credible." The trial justice also acknowledged the apparent inconsistencies in the testimony:

"[I]n one case, they talk about the act occurring in the cellar, and [in] the other case the act occurring in the bedroom. Remember, we're talking about [an eleven] year-old child, who's testifying about things that occurred four or five years [earlier]. I don't think it really matters where this act occurred, the important thing is it did occur. I believe it did occur. I believe it from all of the testimony * * *."

Consequently the trial justice determined that the evidence presented at trial was sufficient for the jury to conclude that both defendants were guilty beyond a reasonable doubt. We are of the opinion that the trial justice did not overlook or misconceive material evidence and was not otherwise clearly wrong. Accordingly we find no error in his decision to deny defendants' motions for a new trial.

IV

Finally defendant Diel contends that the trial justice erred in allowing leading questions on direct examination.

■ Although it is true that leading questions are generally prohibited on direct examination, there are exceptions to this rule when it is apparent that a witness is hostile or when a situation arises in which an omission is evidently caused by a lack of recollection and a suggestion may assist. *State v. Girouard*, 561 A.2d 882, 888 (R.I. 1989). In addition to these exceptions we have also recognized that the trial justice has discretion to allow leading questions of a "child or other witness of diminished understanding." *Id.* Thus evolved the child-witness exception to the general rule prohibiting leading questions on direct examination.

Contrary to Vanasse's belief, implementation of the child-witness exception does not revert to a mechanical application based on the age of the witness. Indeed, in *State v. Brown*, 574 A.2d 745 (R.I.1990), we held that there was no abuse of discretion when the trial justice permitted the use of leading questions during direct examination of a reluctant and emotionally distraught sexually abused witness who was sixteen years old at the time she testified.

In the case at bar Mary Sue was eleven years old when she testified. The trial justice determined that her tender age, coupled with the apparent difficulty she had in understanding questions, justified the use of leading questions on direct examination. The trial justice, in the exercise of his discretion to permit leading questions, will not be overturned by this court unless there is a clear abuse of discretion or if, in our opinion, there is danger of substantial prejudice to the defendant. *Brown*, 574

A.2d at 748. In the circumstances of this case there was no abuse of discretion that would warrant reversal.

For these reasons the defendants' appeals are denied and dismissed, the judgments of conviction are affirmed, and the papers of the case are remanded to the Superior Court.