**Supreme Court**

No. 2015-245-C.A.

(P1/14-1482AG)

State                                    :

v.                                    :

Jose Lopez.                            :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                :

v.           :

Jose Lopez.         :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Goldberg, for the Court.**   This case came before the Supreme Court on October 26, 2016, on appeal by the defendant, Jose Lopez (defendant or Lopez), from judgments of conviction entered in the Superior Court, following a jury trial.  Lopez was convicted of murder in the first degree, discharging a firearm during a crime of violence, and conspiracy to commit murder.  Lopez, who was a juvenile at the time of the murder, was acquitted of one count of carrying a firearm without a license.[1]

Before this Court, Lopez contends that the trial justice erred by denying his motion for a new trial.  Specifically, he argues that the trial justice overlooked and misconstrued material evidence and that the weight of the evidence did not support the verdicts in this case in light of the bias and interests of the state's witnesses.  For the reasons set forth below, we affirm the judgments of conviction.

---

[1] Lopez turned seventeen years old four days after the murder and was waived out of Family Court following a hearing.

- 1 -

**Facts and Travel**

On Christmas Eve 2013, twenty-one-year-old Ryan Almeida (Almeida) was murdered outside his mother's home at The Galego Court housing project (the Manor) in Pawtucket, Rhode Island. The facts and circumstances leading up to this homicide portray a vengeful and violent gang feud between the "Chad Brown" and the "East Side" street gangs. Jason "Heavy" Gonzalez (Gonzalez), Daquan Watts (Watts), and Lopez are members of the Chad Brown gang, and the decedent was an alleged member of the rival East Side gang. Although the intense antagonism between the two gangs is deeply rooted, the animosity escalated in June 2013 when Lopez's cousin, Jose "Hova" Sanchez, was murdered, allegedly by members of the East Side gang.

The facts of this case are chilling. In the early morning hours of December 24, 2013, Gonzalez, Watts, and Lopez "went for a ride" to the East Side of Providence "[t]o see if [they] could] see anybody from that side of town." They drove up Pleasant Street, down Camp Street, and down Doyle Avenue, looking for enemies to shoot, to no avail, when Watts suggested that they go to the Manor and look for Almeida. After driving past the guard shack at the Manor, Watts directed them to the back of the Manor, where he knew Almeida lived with his mother. Gonzalez and Watts noticed a black car with its engine running and its lights on. Although the vehicle appeared to be unoccupied, there were two occupants in the car—Janelle Lewis (Lewis) and her boyfriend. Lewis, an eyewitness to the murder, testified at trial. Her testimony corroborated the testimony of Gonzalez and Watts and supported their accounts that Lopez was the shooter. After noticing Lewis's vehicle, the Chad Brown gang proceeded out of the Manor and parked on a side street across from the complex.

According to both Gonzalez and Watts, Gonzalez got out of the car and asked for the gun but Lopez objected, declaring that he "wanted to do it." Watts and Gonzalez watched as Lopez pulled a gun out of his shoe and put it in the pocket of his gray hooded sweatshirt. Lopez asked Watts to accompany him because Watts knew his way around the Manor; Gonzalez remained in the car. Watts and Lopez tightened the hoods of their sweatshirts and proceeded into the Manor toward Almeida's apartment. According to Watts, Almeida was coming out of his home when Lopez pulled out the gun, aimed, and fired. Watts heard a total of five gunshots. As Almeida fell to the ground, Lopez and Watts ran back to the car where Watts told Gonzalez that it was Almeida who was coming out of the house, and that "[Lopez] had got him." Watts added, "I heard [Almeida] scream. I think he got hit five times." Lopez agreed, stating, "I think I hit him." The gunshots awakened Almeida's mother, who ran to the door and saw her son lying on the ground outside, bleeding from his abdomen. In his final moments, Almeida worried for his mother, stating, "Ma, don't run out here. I think they're still out here." Almeida died of a gunshot wound to the torso; the manner of death was homicide. It was Christmas Eve morning.

The defendant testified at trial and contested this version of events. According to Lopez, it was he who was driving the car that evening, a white Toyota Solara that he had borrowed from his friend, Nathaniel Robinson (Robinson). After Lopez picked up Watts, Gonzalez, and Tyron Wilcox (Wilcox), Watts suggested that they drive to the East Side to look for rival gang members. Lopez agreed because it was the East Side gang that had killed his cousin, but he stated: "I'm not shooting nobody or nothing." Lopez testified that he did not want to "put [Robinson's] car in a situation." As they were driving to the East Side, Wilcox asked to be taken home to his house in the Manor to "get something." When they reached the Manor, Lopez drove past the guard shack, circled around, and exited the complex. He parked across the street, as

- 3 -

instructed by Watts. Notably, Lopez claimed that he did not notice a black car with its lights on parked in the back of the Manor because he "wasn't paying attention."

Lopez testified that Watts and Wilcox got out of the Solara, donned their hoodies, and walked toward the Manor without speaking a word. Lopez testified that he did not see a gun, and did not know where Watts and Wilcox were going because he "wasn't paying attention." When the men returned to the vehicle, about five minutes later, Lopez asked, "What the hell. What's going on?" Lopez claimed that neither man responded, but that he saw Watts hand something to Gonzalez. He could not identify the item because he "wasn't paying attention." Also, he did not learn of the shooting until the next day, when he watched the news. Lopez averred that he later spoke with Watts, who confirmed that he was the shooter.

Although the events leading up to the shooting were disputed by the witnesses at trial, it was uncontested that Lopez was the first member of the group to speak with the police in the aftermath of the shooting. However, defendant's version of the events did not support the facts uncovered by the detectives during their investigation, including the facts disclosed by Lewis, whose physical description of the shooter matched that of Lopez. Lopez was arrested on April 4, 2014, after the detectives secured an arrest warrant based on surveillance images captured by a camera on the guard shack of the Manor. The images depict the Toyota Solara entering into the complex in the early morning hours of December 24, 2013; based on the images, the police traced the vehicle to Lopez. After an initial denial, Lopez eventually admitted that he had been the driver of the Solara, but that Watts was the shooter. Subsequently, the detectives secured warrants for Watts and Wilcox, and then arrested Gonzalez.

When Watts and Gonzalez learned that Lopez "gave up everybody" and "point[ed] the finger at [them]," the tables turned. Watts and Gonzalez agreed to cooperate with the state and

testify against Lopez.[2]  At trial, both Watts and Gonzalez declared that Lopez was the shooter. Their testimony and that of the other witnesses for the state convinced the jury of Lopez's guilt. He was convicted of murder, discharging a firearm during a crime of violence, and conspiracy to commit murder.

After the trial justice denied Lopez's motion for a new trial, he was sentenced to two mandatory consecutive sentences of life imprisonment for first-degree murder and for discharging a firearm resulting in death.  He also was sentenced to a consecutive ten-year term of suspension and probation for conspiracy to commit murder.  Lopez filed a timely notice of appeal to this Court; he was eighteen years old at the time.

## Standard of Review

When passing on a motion for a new trial in a criminal case, "the trial justice must determine 'whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt.'" State v. Staffier, 21 A.3d 287, 290 (R.I. 2011) (quoting State v. Peoples, 996 A.2d 660, 664 (R.I. 2010)).  "When making this determination, 'the trial justice acts as a thirteenth juror, exercising independent judgment on the credibility of witnesses and on the weight of the evidence.'" Id. (quoting State v. Heredia, 10 A.3d 443, 446 (R.I. 2010)). "Specifically, 'the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" Id. (quoting Heredia, 10 A.3d at 446).  "If the trial justice agrees with the jury's verdict,

---

[2] Watts pleaded guilty to first-degree murder, conspiracy, and carrying a firearm without a license; he was sentenced to serve a single life sentence for first-degree murder and ten years concurrently for conspiracy and carrying a firearm without a license.  Gonzalez pleaded guilty to conspiracy and carrying a firearm without a license; he was sentenced to two concurrent terms of ten years, three years to serve with seven years suspended and probation.

the inquiry is complete and the motion for a new trial should be denied."[3] Id. (citing State v. Morales, 895 A.2d 114, 121 (R.I. 2006)).

Furthermore, "[i]n cases in which the trial justice has articulated a sufficient rationale for denying a motion for a new trial, the decision will be given great weight. Such a judgment will be disturbed only if the trial justice has overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong." State v. Banach, 648 A.2d 1363, 1367 (R.I. 1994) (citing State v. Robbio, 526 A.2d 509, 513 (R.I. 1987)). "This Court employs a 'deferential standard of review because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" State v. Baptista, 79 A.3d 24, 29-30 (R.I. 2013) (quoting State v. Paola, 59 A.3d 99, 104 (R.I. 2013)).

## Analysis

The sole issue before this Court is whether the trial justice erred in denying defendant's motion for a new trial. Specifically, we are tasked with considering whether the trial justice overlooked or misconceived material evidence and clearly erred when he credited the testimony of two biased cohorts—Watts and Gonzalez. We perceive no error.

After carefully reviewing the record before us, we are satisfied that the trial justice properly weighed the evidence presented at trial and independently assessed the credibility of the witnesses when he concluded that he agreed with the jury's verdict. See Banach, 648 A.2d at 1367 (holding that the trial justice did not err in denying a motion for a new trial where he

---

[3] See State v. Staffier, 21 A.3d 287, 290-91 (R.I. 2011) ("If, however, the trial justice does not agree with the jury verdict, he or she is required to proceed to a fourth step in the new trial analysis to 'determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted.'" (quoting State v. Guerra, 12 A.3d 759, 765-66 (R.I. 2011))).

reviewed the physical evidence presented at trial, independently assessed the credibility of the witnesses, and articulated his reasons for the denial). The trial justice prefaced his reasoning for denying the motion by quoting from this Court's decision in State v. Mattatall, 603 A.2d 1098 (R.I. 1992), stating:

> "[W]hen a defendant elects to testify, he runs the very real risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth. * * * As long as there exists some other evidence of the defendant's guilt, disbelief of a defendant's sworn testimony is sufficient to sustain a finding of guilt. * * * 'A trier of fact is not compelled to accept and believe the self-serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn.'" Id. at 1109 (quoting United States v. Cisneros, 448 F.2d 298, 305 (9th Cir. 1971)).

We consider this passage befitting for the issue at hand. This case was a straightforward credibility contest between defendant and his co-conspirators, Watts and Gonzalez. The defendant elected to testify, and the jury rejected his testimony, a repudiation that the trial justice found to be "not at all surprising."

The trial justice assessed defendant's credibility by recounting portions of his testimony, honing in on the myriad of untruths that he offered to the jury. The inconsistencies began with defendant's claim "that he was not a member of the Chad Brown gang" despite his appearance in Facebook photographs flaunting the iconic Chad Brown "C" hand sign and his repeated Facebook references to his friends as "fellow gang members." The defendant testified that he "didn't know there was a gun in the car" even though the nearly identical testimony of Watts and Gonzalez named him as the gunman. The trial justice found that, in further conflict with defendant's apparent ignorance of the gun, is the sad reality of gang life—that "one never enter[s] into enemy territory without a gun"—and that there is "no reason to go into enemy

territory unless [intending] to shoot somebody." The trial justice concluded that defendant's testimony, in addition to his disclaimer that he would drive to the East Side but not shoot at anyone, was "simply not credible. At the very least, [defendant] knew full well that this car ride was bent on violence and, as well, revenge and retaliation for [his cousin's] death." The defendant's version of the moments after the shooting, when he stated that Watts and Gonzalez returned to the car and neglected to mention the shooting, also was categorized by the trial justice as "simply ridiculous."

In contrast to defendant's testimony, the trial justice credited that of Watts and Gonzalez and found "[a]t the very least, the evidence demonstrated that all three of them were involved in a conspiracy to commit murder. * * * Gonzalez last saw the gun in Lopez['s] hands, and Watts said he saw Lopez actually shoot Almeida." The trial justice concluded, based on the evidence adduced at trial, that the jury was warranted in accepting that testimony. We are inclined to agree. When a defendant in a criminal case elects to testify on his own behalf, he can expect rigorous cross-examination from the prosecution that may well serve as the final persuasive factor convincing the jury of his guilt.

In the context of a motion for a new trial, this Court has articulated that, even if "the evidence and the reasonable inferences to be drawn therefrom are so nearly balanced that reasonable individuals could arrive at different results * * * the new trial motion must be denied." Connors v. Gasbarro, 448 A.2d 756, 759 (R.I. 1982). Here, however, the approximately one hundred and fifty pages of the record devoted to defendant's testimony yields little room for a near balance of the evidence or the potential for reasonable minds to arrive at different results. Rather, after a fair reading of defendant's testimony, any doubt that existed in the minds of the jurors after the testimony of Watts and Gonzalez evaporated. See State v. Cacchiotti, 568 A.2d

1026, 1029 (R.I. 1990) (affirming the denial of a motion for a new trial where the defendant's own testimony, when viewed in the context of other highly credible testimony, in all likelihood caused the jury to convict the defendant of involuntary manslaughter).

Thus, when the credible testimony of Watts and Gonzalez is considered in light of defendant's inconsistent, self-serving offering, a rational factfinder could fairly find defendant guilty beyond a reasonable doubt. See Mattatall, 603 A.2d at 1109 (considering the independent evidence adduced at trial in light of the defendant's "patently incredible testimony—testimony full of inconsistencies and contradictions" to conclude that "neither the trial justice nor any rational juror could have entertained any reasonable doubt about [the defendant's] guilt"). Consequently, we are satisfied that the trial justice neither overlooked nor misconceived material evidence nor was the trial justice otherwise clearly wrong in reaching the same result as the jury.

We note that the main thrust of defendant's appeal—that the trial justice should have believed defendant's testimony and not that of the state's witnesses, who he alleges were biased and were driven by motives to lie—is but an attempt to have this Court reassess the credibility of the witnesses, an exercise in which we decline to engage. See Banach, 648 A.2d at 1368 (noting that, credibility determinations belong in a trial court but not in this Court).

At the motion for a new trial stage in a criminal prosecution, credibility assessments are exclusively within the province of the trial justice who "is under no obligation to sift through a witness's testimony and discard only those portions that are patently unbelievable." Banach, 648 A.2d at 1368. Rather, the trial justice may "believe[] one set of facts and disbelieve[] the other." Id. (quoting Fontaine v. State, 602 A.2d 521, 526 (R.I. 1992)); see also Mattatall, 603 A.2d at 1108 ("[The trial justice] may accept or reject conflicting testimony and draw all reasonable inferences therefrom."). In the case before us, the jury and the trial justice were presented with

the possibility that defendant may have been framed by his cohorts; yet, it was their version of the events that was accepted as true and the testimony of defendant was rejected.

The defendant points us to discrepancies between Watts's testimony and Gonzalez's testimony in arguing that the two gang members colluded against him. However, "the presence of some inconsistencies between or among [the statements] of a witness or witnesses at different points in time does not ipso facto render the testimony unworthy of belief." State v. Jensen, 40 A.3d 771, 781 (R.I. 2012). Of course, crediting the testimony of Watts and Gonzalez, and rejecting that of defendant, was within the discretion of the trial justice in passing on a motion for a new trial. We defer to that discretion. See Fontaine, 602 A.2d at 526 ("This court will not act as the arbiter of credibility * * * because that remains a determination that is expressly entrusted to the trial justice."); see also Paola, 59 A.3d at 106 ("[W]e 'defer to trial justices who experience firsthand the delivery and demeanor of a witness's testimony.'" (quoting State v. Ferreira, 21 A.3d 355, 366 (R.I. 2011))).

The trial justice determined that, based on the evidence at trial, the jury was warranted in finding defendant guilty. The weight of the evidence, namely the independent eyewitness testimony of Lewis, coupled with that of Watts and Gonzalez, clearly established that defendant was the shooter rather than an unsuspecting getaway driver who "wasn't paying attention." See State v. Vanasse, 593 A.2d 58, 67 (R.I. 1991) ("If in [the trial justice's] independent assessment the trial justice determines that the evidence adduced at trial is sufficient for the jury, as factfinders, to conclude that it proves guilt beyond a reasonable doubt, the motion for a new trial must be denied." (citing State v. McGranahan, 415 A.2d 1298, 1302 (R.I. 1980))).

Accordingly, we are satisfied that the trial justice fulfilled his role as the thirteenth juror by independently weighing the evidence in light of his charge to the jury and assessing the

credibility of the witnesses. His conclusion that he agreed with the verdict thus ended his role in the new trial analysis. We decline to disturb that decision.

## Conclusion

For the reasons stated in this opinion, we affirm the judgments of conviction. The papers in this case shall be remanded to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        State v. Jose Lopez.

**CASE NO:**        No. 2015-245-M.P.
                         (P1/14-1482AG)

**COURT:**        Supreme Court

**DATE OPINION FILED:**    December 6, 2016

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                         Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

                For State:    Virginia M. McGinn
                               Department of Attorney General

                For Defendant:  Kara J. Maguire
                                 Office of the Public Defender